IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 25, 2022

## STATE OF TENNESSEE v. ROBERT DANIEL OWENS, JR.

**Appeal from the Criminal Court for Hamilton County
Nos. 302355, 302438      Thomas C. Greenholtz, Judge**

_____

**No. E2021-00814-CCA-R3-CD**

_____

The Defendant, Robert Daniel Owens, Jr., pleaded guilty to one count each of aggravated burglary, domestic assault, assault, and aggravated stalking, and he received an effective sentence of four years on supervised probation after service of eleven months, twenty-nine days in confinement, followed by a consecutive sentence of two years on unsupervised probation. A revocation warrant was issued, and following a hearing, the trial court found that the Defendant violated the conditions of his probation, revoked his probation, and ordered him to serve his sentences in confinement. On appeal, the Defendant contends that the trial court abused its discretion by ordering him to serve his sentences in confinement. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Mitchell A. Raines (on appeal), Assistant Public Defender – Appellate Division; Ardena J. Garth, District Public Defender; and Jay Perry (at hearing), Assistant Public Defender, for the appellant, Robert Daniel Owens, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Neal Pinkston, District Attorney General; and Colin Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

On December 5, 2017, the Defendant pleaded guilty to aggravated burglary, domestic assault, assault, and aggravated stalking. He agreed to serve concurrent sentences of eleven months, twenty-nine days for domestic assault, eleven months, twenty-nine days for assault, and four years on probation for aggravated burglary after first serving eleven months, twenty-nine days in confinement. He also agreed to serve two years on unsupervised probation for aggravated stalking consecutive to his four-year probationary sentence for aggravated burglary. He received pretrial jail credits for time served and was released to probation following entry of the judgments.

The Defendant's probation was revoked in full in March 2019 based on his arrest for possession of methamphetamine and failure to report that arrest to probation, his absconding from probation, and his failure to pay restitution. The court ordered the original sentences into execution. In May 2019, the court granted the Defendant's motion to reduce his sentence and reinstated him to probation with a condition requiring him to complete treatment at the House of Refuge. Based on the Defendant's absconding and his failure to complete treatment at the House of Refuge, the court later partially revoked the Defendant's probation, extended the Defendant's probation for two years, and again required him to complete treatment at the House of Refuge.

On February 23, 2021, a warrant was issued and the probation violation report underlying the present revocation was filed, alleging that the Defendant was arrested on February 8, 2021, for possession of methamphetamine and possession of drug paraphernalia and that he failed to report the arrest to probation. The report also alleged that the House of Refuge manager reported that the Defendant was dismissed from the program on July 13, 2020, because of a "conflict with [the] program" and that the manager knew the Defendant moved to another house but could not provide the address. The last telephone number on file for the Defendant was disconnected, and a "CLEAR report" obtained by the Defendant's probation officer reflected an address in Ringgold, Georgia. The Defendant's probation officer contacted the House of Refuge again in November 2020, but the Defendant had not returned, and the program did not know the Defendant's whereabouts. The Defendant was considered to have absconded from probation. The report also alleged that the Defendant failed to complete the program as a condition of probation.

At the revocation hearing, Officer Teddy Dyer with the City of East Ridge Police Department testified that on February 8, 2021, around 3:00 a.m. he was on patrol and observed the Defendant running away from Easy Auto Sales. Officer Dyer initiated an

interaction with the Defendant to inquire into his behavior. The Defendant informed Officer Dyer that his car broke down and that "he was looking for a buddy's house to help him get his car fixed." Officer Dyer found the Defendant's behavior suspicious because the Defendant "was heading back to where his car was and yet he was saying he was looking for his friend to get some car parts." During the interaction, the Defendant gave Officer Dyer consent to search his person, and Officer Dyer found a syringe in the Defendant's back pocket and a "small baggie" in his front pocket containing about 0.6 grams of a substance the Defendant admitted was methamphetamine. Officer Dyer arrested the Defendant. On cross-examination, Officer Dyer testified that the Defendant indicated that he was having car trouble and that Officer Dyer attempted to locate the Defendant's car to verify his story. Officer Dyer visited an apartment complex, observed the vehicle described to him by the Defendant, and returned to the Defendant to talk with him again. During the second interaction, Officer Dyer requested consent to search and found the methamphetamine and the syringe on the Defendant's person.

The Defendant's probation officer, Ms. Angelina Carr, testified that a first probation violation warrant was filed in August 2018 because the Defendant was arrested and charged with possession of a controlled substance and because he absconded from probation. After the Defendant was reinstated to probation, he was being treated at the House of Refuge but left the program in 2019. Another probation violation warrant was filed. The Defendant was eventually reinstated to probation in April 2020, and he returned to treatment at the House of Refuge. She stated that she received the Defendant's case in April 2020 and that there was no in-person reporting at that time due to COVID-19. On May 27, 2020, another probation official conducted a field visit with the Defendant at the House of Refuge.

On cross-examination, Ms. Carr testified that her contact with the Defendant consisted primarily of telephone calls except for the home visit. She spoke to the Defendant in May 2020 to discuss the case plan goals via telephone, and she scheduled him for a mental health evaluation via telephone. She stated that on June 8, 2020, the House of Refuge manager reported that the Defendant tested positive for drugs on May 17 and that "there was corrective action" taken. She stated that a risk and needs assessment was conducted on May 29 via telephone. The Defendant was placed on minimum supervision, which entailed reporting to probation every six months. After Ms. Carr's contact with him in May 2020, the Defendant's next report date was November 2020. She stated that no particular method of reporting was set at that time because "when COVID hit everybody kind of scrambled around to try and contact people by phone and let them know that we would continue doing everything by phone." She was certain that she discussed with the Defendant that he should not leave the House of Refuge and that he should contact her to update his address or telephone number. At some point, she learned that on July 16, 2020, the Defendant was dismissed from the

House of Refuge, but the only reason given for dismissal was "conflict with [the] program."

Ms. Carr stated that she tried to contact the Defendant using various methods. She tried to call the Defendant's telephone number listed in his file, but that number was disconnected. On cross-examination, she stated that "everything I had was disconnected except for his boss who I spoke to and he was not working with him at that time." She stated that minimum supervision offenders would call her desk telephone and that the voicemail on her desk telephone listed her cell phone number. She stated that because she was "mostly working from home," offenders would call her desk telephone, and if she could not be reached, they would call her cell phone. She stated that she had her desk telephone forwarded to her cell phone. She agreed that it would have been typical for her to return missed telephone calls. She ran a CLEAR report, which listed an address in Ringgold, Georgia, but she stated that the probation office does "not investigate anything outside of Tennessee." She again called the House of Refuge in November 2020, but the Defendant had not returned to the program. On cross-examination, she said that on December 26, 2020, she tried to call the telephone numbers listed in the Defendant's file but that they were disconnected. She obtained another CLEAR report, which still listed an address in Ringgold, Georgia.

Ms. Carr stated that she considered the Defendant to have absconded because his whereabouts were unknown and that she did not have any contact with the Defendant between July 2020 and February 2021. She agreed that she would have made a note in her file if the Defendant had called her during that time. She filed a probation violation report in February 2021. When asked if the Defendant ever contacted her to inquire about transferring his probation to Georgia, she responded, "I really can't recall much of that conversation." She stated that "it would not have been approved because he was court ordered to complete the program here before he could have moved anywhere to Georgia, unless there was a specific court order that was changed giving him permission."

The Defendant testified that he was released to reside at the House of Refuge in April 2020 as a condition of probation. He agreed that in May 2020, a probation official met with him in person at the House of Refuge and that he completed a risk and needs assessment via telephone. He stated that at the time of his assessment, he requested Ms. Carr to transfer his probation to Georgia. He stated that he "had been told give her 45 days and she could probably get it done." He said that during the second week he was at the House of Refuge, he was transported from the House of Refuge by ambulance because he was running a fever. He was not allowed to return to the House of Refuge until he tested negative for COVID-19, so he slept in a van that night but was directed to stay with his parents in Ringgold, Georgia. He learned that his COVID-19 test results

- 4 -

were negative about five days later and returned to the House of Refuge. About two months later, after one of his coworkers tested positive for COVID-19, the Defendant was sent home from work, so he returned to the House of Refuge. However, he again was directed to stay with his parents in Ringgold, Georgia, until he tested negative. He returned to the House of Refuge about a week later after testing negative. After he returned, he "talked to Ms. Carr or some of the ladies on the phone from work" about getting his probation transferred to Georgia so he could live with his parents. He stated that he also told the House of Refuge about transferring his probation to Georgia but that he was told, "If you want to leave in 45 days, . . . why don't you just go ahead and leave now." He said he was told "to get out."

The Defendant stated that his parents took him from the House of Refuge to the Oxford House. He said that he called Ms. Carr and left her messages but that she never returned his calls. He said he stayed at the Oxford House for three months before it closed. He moved to the Oxford House because he "knew that . . . [he] was supposed to be in a sobriety house . . . and knew [he] was supposed to be doing the right thing." According to the Defendant, one of his coworkers was "a president at Oxford House" and allowed the Defendant to enter the Oxford House after paying a $240 entry fee. While he was staying at the Oxford House, his employment ended, and he began "helping a guy put trailers up and underpinning trailers." He stated that his cell phone was stolen at work and that he called and left Ms. Carr the Oxford House's telephone number in a message. He testified that he called Ms. Carr at least once every other week and "left messages and numbers" but never heard back from her. He said, "I know I probably should have – I didn't know whether to go out there." He "just left her messages is about as far as [he] went . . . trying to stay in contact." He said he left the Oxford House and went to his girlfriend's home.

On cross-examination, the Defendant agreed that the trial court did not approve any request for him to move into the Oxford House, to move to Georgia, or to move in with his girlfriend. He agreed he knew that he was "probably in trouble" but stated that he left messages with Ms. Carr. He said that he called Ms. Carr's cell phone number and left voicemail messages that included telephone numbers where she could reach him. He said that around February 8, 2021, he started working for PMR Construction and that he was earning about $400 per week. The Defendant agreed he had prior opportunities to serve part of his sentence on probation in this case but violated his probation in each situation. He agreed he was requesting another opportunity to be on probation.

Ms. Carr was recalled to testify in rebuttal. She did not recall receiving messages from the Defendant "with any verifiable information for him." She said that she "miss[ed] calls sometimes here and there" but that she would not have cited the Defendant for absconding if he had tried to contact her in order to give her updated

- 5 -

information. She said that offenders are "notified to come into the office and speak to somebody" and that the Defendant had the opportunity to do so if he was confused. She stated that she tried calling the Defendant's boss, "being the House of Refuge," for months to ascertain whether anyone had heard from the Defendant. She agreed that she has a practice of checking her telephone for voicemails and that she would have followed up on any attempts by the Defendant to leave contact information.

The trial court credited Officer Dyer's testimony regarding his encounter with the Defendant and his finding a controlled substance and a syringe in the Defendant's pockets. The court found that the Defendant admitted to Officer Dyer that the substance found in his front pocket was methamphetamine. The court found that the syringe was "in close proximity to the methamphetamine" and that the syringe was drug paraphernalia rather than for "other lawful use." Accordingly, the trial court found that the Defendant violated both his four-year sentence or supervised probation and his two-year sentence of unsupervised probation by committing a new criminal offense. The court found that the Defendant failed to report that arrest to his probation officer. The court stated that, although that "is more of a . . . technical violation, . . . [i]t's an important violation though because once again the presence of new criminal conduct may tend to raise questions about whether rehabilitative efforts currently ongoing are effective." However, the Defendant failed to report his arrest even after being released on bail following that arrest.

The court found that the Defendant absconded from probation and that the Defendant failed to report from November 2020 through February 2021 "or at any time before the execution of the probationary capias . . . [in] March of this year." The court credited Ms. Carr's testimony that she failed to locate the Defendant even after she ran CLEAR reports to locate other possible residences, contacted former employers, including the House of Refuge, and called the telephone numbers listed in the Defendant's file. The court declined to credit the Defendant's testimony that he attempted to call Ms. Carr once every other week but never heard from her. Specifically, the court found that the Defendant's testimony was "inconsistent with all of the other proof in the record." The court found that the record was unclear "exactly why [the Defendant] was discharged" from the House of Refuge program and that the Defendant did not violate the condition of probation requiring him to complete the program.

Regarding the consequences of the violations, the court considered the seriousness of the violations, the willfulness of the violations, the Defendant's prior history of probation, past efforts at rehabilitation, previous violations of probation, future amenability to correction, including acceptance of responsibility and genuine remorse, and evidence that the Defendant would comply with the court's orders. The court found that absconding was "a serious violation" that "represents an attempt by [the Defendant]

once again to decide for himself under what circumstances he'll abide by the orders of the court." The court stated that it ordered the Defendant at the Defendant's request to attend and complete the House of Refuge program "despite him having been removed from it previously." The court found that the Defendant decided for himself "that other avenues were better for his rehabilitation" and moved to the Oxford House and moved in with his girlfriend without the court's permission. The court found that the Defendant "was living as though he were not on probation . . .[a]nd that is a problem." Additionally, the Defendant's actions demonstrated to the court his "unwillingness to abide by Court orders."

The court found that the Defendant previously violated his probation in the present case twice and that in both prior violations he previously absconded from probation. The court found that prior violations on the basis of absconding "have not been sufficient to reinforce the importance of reporting requirements" and that "[p]robation isn't working." Noting that the most recent violation was sustained on April 7, 2020, the court found that the new violations occurred "within a couple of months of that occurring . . . [a]nd then, of course, within six months, he's completely off the radar and has been gone." The court considered the Defendant's failure to complete the House of Refuge program during that time in determining the consequence of probation.

The court found that there was "little evidence" of the Defendant's future amenability to rehabilitation in the record. The court stated that it "ha[d] to be assured that the probationer will voluntarily comply with the Court's effort at effective rehabilitation" and that "[e]ffective rehabilitation cannot occur where the probationer does not voluntarily comply with those efforts." The court found that there was no evidence the Defendant would comply with the court's orders and that it could not impose "a set of orders . . . that will result in [the Defendant's] voluntary compliance." The court found that the Defendant had not provided a plan for future compliance with the conditions of probation and without such a plan, the court "does not find that future rehabilitation is reasonably likely." The court found that the Defendant had not genuinely accepted responsibility and that he only provided statements of effort to report that lacked credibility as reasons for his failure to comply with the conditions of probation. After considering the totality of the circumstances, the court ordered the Defendant to serve his sentences in confinement. The Defendant appeals.

## ANALYSIS

The Defendant contends that the trial court abused its discretion in determining the consequence for his violating the conditions of probation. The Tennessee Supreme Court recently clarified that probation revocation is a "two-step consideration" that requires a trial court to (1) determine whether to revoke probation and (2) determine the appropriate

consequence upon revocation. *State v. Dagnan*, 641 S.W.3d 751, 757 (Tenn. 2022). In making its findings, the trial court resolves questions concerning the credibility of witnesses. *State v. Estevenico Chandler, Jr.*, No. E2020-01409-CCA-R3-CD, 2021 WL 5119167, at *3 (Tenn. Crim. App. Nov. 4, 2021) (citing *Bledsoe v. State*, 387 S.W.2d 811, 814 (Tenn. 1965)), *no perm. app. filed*; *see Dagnan*, 641 S.W.3d at 757 (citing *State v. Jess R. Amonette*, No. M2001-02952-CCA-R3-CD, 2002 WL 1987956, at *3-4 (Tenn. Crim. App. Aug. 29, 2002)). On appeal, we review the trial court's determinations for an "abuse of discretion with a presumption of reasonableness so long as the trial court places sufficient findings and the reasons for its decision as to the revocation and the consequence on the record." *Dagnan*, 641 S.W.3d at 759. "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010); *see Dagnan*, 641 S.W.3d at 758. "It is not necessary for the trial court's findings to be particularly lengthy or detailed but only sufficient for the appellate court to conduct a meaningful review of the revocation decision." *Dagnan*, 641 S.W.3d at 759. If, however, the trial court fails to place sufficient reasoning for its revocation decision on the record, "the appellate court may conduct a de novo review if the record is sufficiently developed for the court to do so, or the appellate court may remand the case to the trial court to make such findings." *Id.*

A trial court has the discretion to revoke probation if it finds by a preponderance of the evidence that a defendant violated the conditions of probation. *See* T.C.A. §§ 40-35-310, -311(e) (2021), *amended by* 2021 Tennessee Laws Pub. Ch. 409 (eff. Date July 1, 2021); *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001). In the present case, the court found that the Defendant violated his probation because he was arrested for possession of methamphetamine and drug paraphernalia, failed to report that arrest to his probation officer, and absconded from probation. The Defendant does not contest on appeal the trial court's determination that the Defendant violated the conditions of his probation.

Instead, citing to *State v. Mitchell,* the Defendant argues only that the trial court abused its discretion because it failed to make findings regarding whether incarceration would best serve the Defendant's and the public's interests. *See State v. Mitchell*, 810 S.W.2d 733, 736 (Tenn. Crim. App. 1991) ("We agree that a revocation decision is best tested by whether such an action would serve the ends of justice and be in the best interest of both the public and the defendant/appellant."). The statutes in effect at the time of the Defendant's revocation hearings allowed a trial court, after finding that a defendant had violated the conditions of probation, to impose one of several alternative consequences: (1) order incarceration for some period of time; (2) cause execution of the sentence as it was originally entered; (3) extend the defendant's probationary period by

up to two years; or (4) return the defendant to probation on appropriate modified conditions. *Dagnan*, 641 S.W.3d at 756; *see also State v. Brandon L. Brawner*, No. W2013-01144-CCA-R3-CD, 2014 WL 465743, at *2 (Tenn. Crim. App. Feb. 4, 2014) (citing T.C.A. §§ 40-35-308(a), (c), -310, -311(e)(1); *State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999)). In the present case, the trial court made thorough findings regarding the consequence of probation. The trial court considered the seriousness of the violations, the willfulness of the violations, the Defendant's prior history of probation, past efforts at rehabilitation, past violations of probation, and future amenability to correction, including the Defendant's lack of acceptance of responsibility and genuine remorse and evidence that the Defendant would not comply with the court's orders. Because the trial court placed sufficient findings and the reasons for its decision regarding the consequence of the probation violation on the record, we review the court's decision for an abuse of discretion accompanied by a presumption of reasonableness. *See Dagnan*, 641 S.W.3d at 759. We cannot agree with the Defendant that his interest and the public's interest were not considered in the court's revocation decision. *See Mitchell*, 810 S.W.2d at 736. Rather, the factors upon which the trial court relied in its thorough findings relate to the interests of both the Defendant and the public. Therefore, we conclude that the Defendant has not shown the trial court abused its discretion.

## CONCLUSION

Based upon the foregoing reasons, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE